DOLORES EULOGIA LÓPEZ VDA. DE LÓPEZ, Plaintiff and Appellant, *v.* FÉLIX REXACH and THE MARYLAND CASUALTY Co., Defendants and Appellees.

JUAN LÓPEZ ORTEGA, Plaintiff and Appellant, *v.* FÉLIX REXACH and THE MARYLAND CASUALTY Co., Defendants and Appellees.

Nos. 8079 and 8080. Argued February 7, 1941.—Decided February 28, 1941.

*Brown, González & Newsom* and *E. Córdova Díaz,* for appellants.
*Cayetano Coll y Cuchí* and *Enrique Igaravídez,* for appellees.

MR. JUSTICE DE JESÚS delivered the opinion of the court.

The trial of these cases was held before the late Pablo Berga, judge of the lower court, and when he died before rendering judgment, the cases were decided by Judge Marcelino Romany by virtue of a transcript of the pleadings and of the evidence submitted through a stipulation of the parties.

It is substantially alleged in both complaints that the defendant Félix Rexach, on October 24, 1938, was the owner of the truck, license plate H–348, insured by the co-defendant, The Maryland Casualty Co., and that on the above mentioned date said truck, through the fault and negligence of its driver, Jacinto Nevárez Landrón, the employee of the defendant Rexach, ran over José López, husband and son respectively of the plaintiffs, inflicting serious wounds and injuries on him as a consequence of which he died in the early morning of the following day. The negligence of the driver consisted, as alleged by the plaintiffs, among other things, in driving the truck at an excessive and unlawful speed, in not keeping its brakes in good condition, in carrying an excessive load, in having swerved said truck towards the left side of the road, and finally, in not having taken the necessary precautions to avoid damage to the persons travelling through the place where the accident took place.

The defendant Rexach admits being the owner of the truck and that said vehicle was then driven by his employee Jacinto Nevárez acting within the scope of his duties, but he denies among other things the acts of negligence alleged by the plaintiffs. Both defendants allege that the negligence of the deceased in crossing the road from south to north in

the manner in which he did was the proximate cause of the accident; they also set forth the defense of contributory negligence, and in regard to the plaintiff father, they further allege that assuming that he were the father of the deceased —a fact which they deny—said plaintiff, was not entitled to receive support from his already mentioned son nor had the latter contracted any obligation of supplying it.

The co-defendant, the Maryland Casualty Co., admitted having issued the policy and accepted its liability under the terms of the same to the amount of $5,000 in the case that it was finally decided that the defendant Rexach was liable for the damages claimed.

The trial judge dismissed both complaints on the following grounds, stated at the end of his opinion as follows:

"We do not wish to be understood, however, as considering the driver of the truck not guilty of negligence. On the contrary, the plaintiff duly fulfilled his obligation and proved, not only with a preponderance of the evidence but beyond any reasonable doubt, the charges that the truck was driven at a great and unlawful speed, that it did not have its brakes in good condition and that it was carrying an excessive load; and we believe further that that negligence of the driver of the truck contributed to the death of the unfortunate Sergeant López. But that negligence was not the only one which caused the accident; the negligence of the deceased also contributed greatly and without it the accident would not have occurred; and it is for this last reason that we dismiss the complaint in this case."

As the trial judge did not see or hear the witnesses testify, we find ourselves in a position identical to his in regard to the weighing of the evidence. *Delgado* v. *Díaz*, 30 P.R.R. 115. Consequently, we shall first make a description of the accident in accordance with the version of one and the other party, and afterwards we shall consider the evidence presented by both parties in support of their respective theories, in order to determine then whether or not the trial judge was justified in refusing to give credit to the witnesses

of the plaintiffs for the reason that their testimony, according to said judge, was contrary to the physical facts which were proven.

■ On the north side of Muñoz Rivera Avenue which is a prolongation of Salvador Brau Street of this city, and in front of the Headquarters and garages of the National Guard, there are two houses built by the United States Army to be used as military residences. Sergeant José López, on the day of the accident, lived in one of them, that which was nearer to Santurce. At that place, the avenue has a width of 36 feet from curb to curb and from the place where the accident took place towards Santurce, the avenue runs straight for about 200 meters, there being nothing to interrupt visibility from that distance. There are no streets on the north side of the avenue as said side consists in a strip of land which is quite narrow and which abruptly descends towards the sea from a considerable height; but on the Southern side there are several short streets which connect it with Ponce de León Avenue. On the day of the happenings, towards 1:30 P. M., Sergeant López was riding along said avenue from San Juan toward his home in a motorcycle with a sidecar, riding on the right side of the road and at a moderate speed. A few minutes before arriving at the lot where the building of the National Guard is located, an automobile which was riding in the same direction caught up with him. López swerved to his right even more, thus making way for the automobile to pass and the latter continued until at the avenue from south to north, but on noticing that the truck license plate H–348, which was riding at the time along the avenue from Santurce to San Juan. There is no controversy in regard to the facts which we have just stated. According to the witnesses for the plaintiffs, when Sergeant López was approaching the front of his house, he tried to cross the avenue from south to north, but on noticing that the truck was approaching on an opposite direction, he stopped the

motorcycle to his right, at a distance of 13 feet 10 inches from the curb at the southern part of the avenue. The truck, which ran at a speed of around 50 kilometers per hour more or less, zigzagged then towards its right at first and towards the left immediately afterwards, continuing in that direction and finally colliding with the motorcycle and throwing it in the air a distance of a few feet, the latter falling upside down, and at the same time throwing the sergeant near the southern curb of the avenue and running over him, the truck then climbing over the curb, and coming to a stop with its four wheels on the sidewalk on a narrow strip of land which separates the southern curb of the avenue from the rear walls of the garages of the National Guard when one of its rear wheels sank into the ground almost to the axle, causing slight damages to said wall.

According to the witnesses of the defendant, the chauffeur Nevares and the workmen of the truck, Zenón de Jesús and Julio Vega, the truck was travelling along its right lane at a speed of 25 or 30 kilometers per hour, at a distance of 2 feet more or less from the north curb. They saw the motorcycle when they were at a distance of 20 feet from it, and all testified that it was riding on its right at a distance of 2 or 3 feet from the curb and that it continued so until it was about 9 feet from the truck, when it suddenly turned towards the left. The chauffeur blew his horn, put on the brakes and swerved towards his left in order to make way for the motorcycle which had arrived at a distance 5 feet from the north curb, but the conductor of the motorcycle got mixed up and instead of proceeding in the same direction, he turned to his right, the left front part of the motorcycle then colliding with the right front side of the truck, the collision taking place, according to the chauffeur, at a distance of four feet from the middle of the road towards the right side of the truck, that is, at a distance of 14 feet from the north curb and not at a distance of 22 feet 10 inches which was the

distance determined by the marks which were left on the road.

It is convenient to state here that immediately after the accident Captains Francis H. Boos and Philip R. Dwyer, as well as Lt. Samuel Arthur Daniels went to the site of the happenings; that around 2:30 P. M. and after having examined the place of the accident, Captains Boos and Dwyer went to the Police Station in Puerta de Tierra, there finding the chauffeur Nevares Landrón, Captain Boos, in the presence of his colleague and of Sergeant Correa of the Insular Police, asked Nevares in Spanish how the accident had occurred, and as the latter did not answer, he asked him anew, Sergeant Correa acting as interpreter. Nevares then answered after shrugging: "I was travelling very fast." The testimony of Captain Boos was corroborated in all of its parts by that of Captain Dwyer, who, the same as his companion, speaks the Spanish language.

Lt. Daniels testified as an expert on the functioning of motor vehicles. In order to qualify as such expert, he testified that he is a graduate from West Point Military Academy and that from September, 1937, to June, 1938, he took a course at the Army Infantry School, Tank Section, in Fort Benning, Georgia; that all the officers who take this course in said institution devote a whole year to the study of the manufacturing of automobiles, their functioning and the manner of taking care of them and keeping them fit; that at the end of those studies, they are sent to the different organizations of the Army as specialists in that branch and that from the time of his graduation at said school he acts as specialist officer in the San Juan Post in the Service Company of the Army. This witness further testified that he is engaged, among other things, in the care and maintenance of the vehicles, keeping them in good condition, repairing them in cases of accident or whenever a tuning up is necessary. Once that he had qualified as an expert the witness testified that im-

mediately after the accident he went to the place of the happenings as that was his duty in accordance with the law, and after describing the position and the manner in which the vehicles remained, he determined the exact place where the accident took place, observing the marks left by the vehicles when they came in contact; that said place was, according to the measurements taken by him, at a distance of 13 feet 10 inches from the southern curb of the avenue. He further observed that from the place where the collision took place to that where the front wheels of the truck finally came to a stop after the accident, there was a distance of 86 feet; that the weight of the truck when empty was that of 6,000 pounds and that when loaded it was not authorized to exceed a total weigh of 12,000 pounds; that the maximum speed authorized for said vehicle is that of 12 miles per hour and that according to the studies which he made of the marks left on the road by the truck, the place where it finally came to stop, etc., he was able to assure that the truck at the time of the accident, was riding at a speed not less than 50 kilometers per hour. The witness further testified that accompanied by the expert of the defendant, Mr. Pascual Hernández, he took the truck and the load which it carried to the scale of the Porto Rico Coal Co. and that it had a total weight of 16,330 pounds, thus showing that it was carrying 3,300 pounds in excess; that is, a total weight equal to 150% of that for which it been built. He also tested the brakes, the expert of the defendants driving the truck at a speed of 20 kilometers per hour at first—being able to bring it to a stop only at a distance of 36 feet from the place where the brakes were applied—and then at a speed of 40 kilometers, he brought it to a stop at a distance of 104 feet. The expert of the plaintiffs as well as that of the defendants, testified that the excess weight in a motor vehicle affects not only the brakes but also its entire functioning. It is evident that the plaintiffs conclusively proved the gross negligence with which the truck

was driven. It was so appraised by the trial court which stated "that that negligence of the driver of the truck contributed to the death of the unfortunate Sergeant López", but the lower court relieved the defendants from liability because it thought that the negligence of the deceased "contributed greatly and that *without it the accident would no have occurred.*" It arrived at this conclusion because it gave credit to the theory of the defendants in regard to the manner in which the accident took place and it discarded the theory of the ocular witnesses of the plaintiffs because it thought that their testimony was contrary to the physical facts which were proven. Let us see if this appraisal is correct.

The trial judge says:

"The witnesses of the plaintiff who alleged that they saw the accident are not worthy of credit to us. Their testimonies are openly in conflict with the physical facts which were proved at the trial.... According to the latter it is clear to us that the collision took place at a distance of 13 feet 10 inches from the left curb going from Santurce to San Juan; yet, all the witnesses of the plaintiff placed the Sergeant at the time of the accident at a distance of 5 feet from the already mentioned curb; Gregorio Ríos went still further by saying that the collision took place after the truck had climbed over the curb."

On this matter the witnesses for the plaintiffs testified:

"*Remigio Usera:*

"Q. Which way was the motorcycle coming when he collided with it?

"A. He was (the witness refers to the conductor of the motorcycle) at least 5 feet from the curb to the road." (T. of E. 76.)

"*Francisco Muriel:*

"Q. But before the crash, did you see where the motorcycle was?

"A. It was riding along its right from here to there.

"Q. And when he hit it, where was the motorcycle?

"A. It was on its right.

"Q. I show you this photograph—Exhibit 11 of plaintiff—and I ask you if it remained in that position after the accident.

"A. Yes, the same as it is there and it was in the middle of the road.

"Mr. Coll: Was the motorcycle in the middle of the road?

"A. After the accident it remained thus.

"Q. After the accident, did the motorcycle remain in the middle?

"A. Yes, sir." (T. of E. 89–90.)

*Rogelio Mercado:*

"Q. Yes, but before the crash, where was the motorcycle and the cyclist?

"A. He was riding along his right.

"Q. Close to his right or to the middle of the road?

"A. To his right.

"Q. Are you sure of that?

"A. Yes, sir." (T. of E. 99.)

*Remigio Ríos:*

"Q. And at what distance from the right curb of the road did the sergeant stop?

"A. Around 2 or 3 feet.

"Q. It was on that place that the accident took place?

"A. Yes, sir." (T. of E. 105–106.)

*Francisco Roura:*

"Q. Now, where did the motorcycle with the sergeant come to a stop?

"A. More to the right than to the middle of the road.

"Q. But had it stopped?

"A. Yes, sir." (T. of E. 109–110.)

These are the only eye witnesses who testified on behalf of the plaintiffs. We cannot agree with the trial judge when he asserts that their testimonies should be discarded because "all the witnesses for the plaintiffs place the sergeant at the time of the collision at a distance of 5 feet from the above mentioned curb (the southern one)."

All of them, with the exception of Remigio Usera and Gregorio Ríos, testified that the collision took place at the right of the sergeant without determining distances, something which is perfectly congruous with the physical fact to which the court referred. If the road is 36 feet wide in that place, and there is no controversy as to this, its middle will

be at a distance of 18 feet from one and the other curb. As the crash occurred in a place 13 feet 10 inches from the southern curb, the witnesses for plaintiffs are right in affirming that at the time when the collision took place, the sergeant was on the right side of the road.

In regard to the witness Remigio Usera, as it may be seen from his testimony, he does not affirm that the sergeant was at a distance of 5 feet from the curb, since what he really stated was that "he was *at least* 5 feet from the curb of the road." It is an estimate which may be mistaken but this is no ground to reject his testimony, since it appears from it that he did not take any measures and we all know how inaccurate ignorant witnesses are in regard to the computation of time and distances. On the other hand, if we consider that the motorcycle was 4 feet wide, it will be seen then that the place where the sergeant was, according to this witness, was 9 feet from the southern curb. The error in the computation therefore consists only of 4 feet. We may say more or less the same in regard to the testimony of Gregorio Ríos.

"It must be borne in mind that an accident of this sort occurs with unusual swiftness, and causes the consequent excitement, and is not to be expected, nor should it be required, under the circumstances, that a witness fix with mathematical exactitude facts and details which were hastily observed. When these facts thus narrated could have occurred and developed in the manner expressed by the witness, his degree of credibility should not depend upon a lack of precision in fixing the distance, or on a slight variation in estimating the same." *López* v. *American Railroad Co.*, 50 P.R.R. 1, 17.

"We have carefully read the transcript of the evidence and fail to find anything in the testimony of the witnesses for the plaintiff to question their veracity. Their answers are categorical, without evasions or contradictions, and although there are certain discrepancies between them as to the exact time of the occurrence of the accident, the width of the highway, the distance between Navarro and the grade crossing, etc., etc., such discrepancies, far from weakening the probatory force of their testimony, strengthen the same, as they show that the evidence of the plaintiff had not been fabricated.

"Every student of Evidence is acquainted with the classic experience of several persons who witness an accident and who afterwards, when reciting the facts, cannot fully agree, even between two of them, in every detail. Moreover, it is of common knowledge the wrong notion of time and space generally found in uneducated witnesses; and the fact should not be overlooked, either, that in the instant case the witnesses gave their testimony three years after the accident occurred." *Navarro* v. *Compañía Azucarera "El Ejemplo"*, 53 P.R.R. 692, 696.

Let us now turn once more to the testimony of the witness Ríos in order to determine whether or not the trial judge was justified in stating that this witness "went still further, by saying that the collision took place *after the truck had climbed the curb.*"

"Q. How was that truck riding?

"A. At an excessive speed, and at that moment Sergeant López was coming in his motorcycle from San Juan to Santurce, towards his home. He was riding along his right. He was riding at a minimum speed and at the time when the truck was coming so fast, the truck was riding more to its left which was equivalent to the right side of the sergeant, and at that same moment the truck, as it was riding so fast, zigzagged, climbed over the curb and hit the wall of the National Guard, *and at that very moment it hit the motorcycle with its right fender and overturned it* and it threw the sergeant to its right." (T. of E. 100–101.)

"Q. At what distance from the right curb of the road did the sergeant come to a stop?

"A. Around two or three feet.

"Q. And it was on that place that the accident took place?

"A. Yes, sir." (T. of E. 105–106.)

We have examined carefully and dispassionately the testimony of this witness and it is not possible to interpret it as the trial judge did. It may be seen from the above transcription how inaccurate the witness is in his expression, but affirming as he does that the accident occurred in the place where the sergeant was—which according to him was 2 or 3 feet from the curb—the phrase "and at that moment it hit the motorcycle with the right fender, etc.", cannot refer to

the moment when the truck had climbed over the sidewalk, as the sergeant was not there and the collision must have necessarily taken place before the truck climbed the curb.

The theory of the defendants is the one which seems incredible to us. The chauffeur Nevárez Landrón, star witness of the defendants, testified that he was riding at a speed of 25 or 30 kilometers per hour, on his right, and that the the sergeant was also driving on his right; that when the truck and the motorcycle were at a distance of 15 or 20 feet from one to another he saw that the sergeant suddenly turned towards his left, coming to a distance about 5 feet from the northern curb; that Nevárez then turned to his left but the cyclist got mixed up and turned once more towards his right, colliding then with the truck at a distance about 4 feet from the middle of the road, towards the right side of the chauffeur. Assuming for the sake of argument that the truck was travelling at a speed of 25 or 30 kilometers per hour, as Nevárez testified, it should have covered 500 meters in a minute and 8 and 2/3 meters in one second, that is, around 28 feet. That distance could have been easily covered by the truck in less than one second. How is it possible then that the cyclist in less than one second could have crossed the road until he came to a distance around 5 feet from the northern curb and there turn around, especially in a motorcycle with a sidecar, to come four feet from the middle of the road where, according to the chauffeur, the collision took place? Another witness of the defendants, Julio Vega, went still further when he testified that when the truck and the motorcycle were at a distance of 3 meters from each other, that is, 9 feet, the motorcycle swerved to its left and then came back to its right to collide with the truck. (T. of E. 158.) On being cross-examined, this witness, exaggerating still more, testified:

"Q. But the first movement of the motorcycle towards your right side, was it when you were at a distance of 3 meters?

"A. No, sir, when we saw it it was 3 meters away, *but when it crossed it was nearer.*" (T. of E. 160–161.)

The other witness of the defendants, Zenón de Jesús, testified as the chauffeur did, that when he saw the motorcycle, the latter was driving a distance of 6 feet more or less from the southern curb and at a distance of 20 feet from the truck. (T. of E. 130.)

The lower court seems to have been strongly impressed in favor of the defendants by the mere fact that the left part of the motorcycle collided with the right front of the truck, but in our opinion, this circumstance is not decisive in the present case, as in the excitement of the moment, when López realized the immediate danger in which he was when he saw the truck coming towards him, we do not know what movement he could have made at that instant, and unfortunately for the plaintiffs he could not throw any light on this matter.

■ It is not enough that the defendant allege contributory negligence. It is also necessary that he prove it by a preponderance of the evidence unless such negligence might be inferred from the evidence of the plaintiff. *Rosado* v. *Ponce Ry. & Light Co.,* 20 P.R.R. 528; *González* v. *Malgor, Luiña & Co.,* 29 P.R.R. 97; *Maldonado* v. *Hamilton,* 32 P.R.R. 208, and *Rush* v. *Lagomarsino,* (Cal. 1925) 237 Pac. 1066.

■■ We do not doubt that the deceased would have been wiser if he should have remained near the right edge of the road until the truck went by, and it might even be accepted that he was negligent in not doing so, but that negligence on his part does not affect the result of the case as the mere negligence on the part of the deceased does not deprive the plaintiffs of their right to indemnity unless he has contributed to the accident as the proximate cause of the same. *Rush* v. *Lagomarsino, supra.*

In our opinion, the conduct of Sergeant López only furnished a condition within which the negligent act of the

chauffeur of the defendant Rexach developed, a negligent act which in our opinion was the proximate cause of the accident. *Colón* v. *Shell Co.*, 55 P.R.R. 575.

In the case of *Delgado* v. *Díaz, supra,* it was stated by this Court:

"The evidence so submitted is strong and convincing that the appellee's chauffeur was going at an unusually high rate of speed; that the boys whom he tried to avoid striking were in plain sight, and it is a necessary deduction that if, on seeing them, he had reduced his speed instead of trying to avoid them, the accident probably would not have happened. When someone appears on the road in front of a chauffeur it is his duty to have his machine under such control as the circumstances may require. The law as set forth in *People* v. *Blandford,* 23 P.R.R. 580, is applicable. A chauffeur has no right to rely on his ability to get by. The evidence tends to show that there was not only a high rate of speed, but that such speed was in excess of the speed limit. Therefore the judgment must be reversed and another rendered for the complainant."

See on this point *Welch* v. *Sink,* (Cal. 1937), 74 P. (2d) 833, 835; *Brush* v. *Kurstin,* (Cal. 1936), 53 P. (2d) 777.

In the instant case if the chauffeur Nevárez had not driven his truck at such an excessive speed in accordance with the circumstances, if his brakes had been in good condition and he had not carried a load so in excess of the one prescribed for the vehicle, he would have been able to control it on time, to reduce the speed and even to stop it without having to put into effect the dangerous maneuver to which he was forced to recur due to his own negligence and lack of care. Considering as we do that the proximate cause of the death of Sergeant López was the negligence of Nevárez without it having been proven by a preponderance of the evidence that there was contributory negligence on the part of the deceased, let us now pass to determine the amount of the damages, deciding first if as alleged by the defendants, the plaintiff Juan López Ortega does not have a cause of action against the defendants on being deprived of the support which he used to receive from his aforementioned son.

Juan López Ortega alleges in his complaint that the deceased used to supply him with money for his maintenance, board, clothing and medical attention in case of illness and from the evidence of the plaintiffs which was not contradicted, it appeared that Juan Ortega was the legitimate father of the deceased; that on May, 1939, said father would have been 69 years of age; that he is very poor and that although he has other sons, none of them is in a position to help him as all of them are very hard pressed; that the plaintiff had been for a long time without work and that deceased used to give him $19 or $20 monthly and also provide him with clothes, shoes and hats and whenever he became ill he found a place for him at the Military Hospital. Under such circumstances, the right of the plaintiff to receive an indemnity for the loss of the support is clear, as was decided in the case of *Ruberté* v. *American R. R.*, 52 P.R.R. 457.

Sergeant López, at the time of his death, judging by the age of his father, should not have been over 50 years of age and he was a strong and healthy man according to the testimony of Lt. Col. Tamraz, of the Medical Corps of the United States Army, who attended him when he was taken to the Military Hospital after the accident and who had known him for some time prior to that date; the rank of the deceased was that of first sergeant with a salary of $105 a month. His wife, in the year 1931, was 31 years old, they had no children, had been married for ten years and when he died, the sergeant did not leave any properties and neither did his already mentioned wife possess any.

We must, for the foregoing reasons, reverse the judgments appealed from and enter in their place the judgments which should have been rendered by the trial court, to wit: in the case No. 8079, which is the one followed by the wife, condemn the defendants jointly to pay to the plaintiff wife the amount of $3,500, plus the costs and $150 as attorney's

fees; and in case No. 8080, which is the one prosecuted by the father of the deceased, condemn the defendants jointly to pay to the plaintiff the amount of $1,500, plus the costs and $150 as attorney's fees, it being understood that the obligations imposed by said judgments on the co-defendant, The Maryland Casualty Co., shall not exceed in any of the cases the amount of $3,500 and $1,500 respectively.

Mr. Justice Todd, Jr., took no part in the decision of this case.